UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Crim. No. 8-117-B-W |
| | ) | |
| JEAN KEIPER, | ) | |
| | ) | |
| Defendant. | ) | |

**RECOMMENDED DECISION
ON MOTION TO SUPPRESS**

Jean Keiper, who is charged in a one-count indictment with possession of a firearm after having been committed to a mental hospital in violation of 18 U.S.C. § 922(g)(4), has filed a motion to suppress statements she made and a firearm that was seized from her residence in Jackman, Maine, on April 10, 2008. I conducted an evidentiary hearing on this motion on September 23, 2008. I now recommend the Court adopt the following proposed findings of fact and deny the motion to suppress.

**Proposed Findings of Fact**

On March 30, 2008, Eugene Cole, a patrol deputy for the Somerset County Sheriff's Office, responded to a complaint from Lawrence Keiper. Keiper reported that a loaded firearm was stolen from his parked and locked vehicle, without signs of forced entry. Keiper suspected that his estranged wife, Jean Keiper, who no longer resided with him but had keys to his house and truck, had taken the Smith & Wesson .357 magnum revolver from his vehicle. Keiper expressed concern that his estranged wife could be either suicidal or homicidal. He informed the deputy that a female physician who lived in Jackman, Maine, where Jean Keiper was now living, had experienced difficulties with Ms. Keiper and that she had obtained a protection order against Keiper on behalf of herself and her family.

Cole determined that he should proceed to Jackman and investigate further. He arrived at Jean Keiper's residence at approximately 2:30 a.m. the morning of March 31, 2008. Before going to the Keiper residence Cole stopped at the Jackman Border Patrol Station and obtained the assistance of two border patrol agents who accompanied him to the residence as back-up. Keiper greeted the officers at the door and allowed them entry into the house. She denied having the gun and gave Cole permission to search her residence. According to Cole, Keiper was cooperative, but he found nothing in his search. Cole wrote a report concerning the incident and he also indicated to his superiors that he believed Keiper was not being truthful about the gun. A detective was assigned to the case for follow-up and Cole thought the detective ultimately obtained an admission from Keiper that she had the gun, although she would not reveal its location. Ultimately, after consultation with an assistant district attorney, and without any knowledge of facts indicating that Keiper was prohibited from possessing the firearm by federal law, the local law enforcement personnel determined that the "theft" case they were investigating should be closed as a marital dispute for which there was insufficient evidence to warrant prosecution.

Cole next became involved in the case on April 10, 2008, when he received a call from the female physician. The physician called him from the Jackman Health Center to report that she had received hearsay information that Jean Keiper had threatened to harm her and/or her family. The information came from a Dr. Karen Moser who worked at the Kennebec Valley Health Center where Keiper was a client who received counseling. According to Dr. Moser, Keiper, a KVHC mental health worker, and Toby Schneider, Keiper's divorce lawyer, had been involved in a three way conversation during which there was mention of a firearm and the possibility of some sort of alleged threat against the female physician in Jackman. Cole was

some distance from Jackman and therefore attempted to investigate the bona fides of this alleged threat before proceeding north some 70 miles to the Jackman Health Center. Cole talked with Dr. Moser, who confirmed that she had called the physician in Jackman and that she had some "concerns." He also eventually made contact with Toby Schneider, who advised that there had been no direct threat made by Jean Keiper.

In the meantime, Warden Raymond Miller of the Maine Warden Service had been dispatched to the Jackman Health Center by the 911 dispatcher for the adjoining county's sheriff department. Since Cole knew that Miller was on the scene and there was no immediate public safety concern, he continued to make inquiries as to how he should best proceed in these circumstances.

Warden Raymond Miller resides in Jackman and was familiar with the people involved in the complaint. At the Jackman Health Center he spoke with the employees and the female physician. He observed that the hospital personnel were quite alarmed by this situation and that the facility had basically placed itself in a lockdown mode. According to a hospital worker, Jean Keiper was at work at her job at a local grocery store and was due to get out of work around 7:00 p.m. The hospital staff apparently feared she would come to the hospital after work. Warden Miller had arrived at the hospital around 5:30 p.m. He spent some time on the radio and telephone trying to learn from Deputy Cole and the various dispatchers the exact nature of the situation. He also believed that his armed presence at the hospital addressed public safety concerns and that he should therefore remain on the scene.

Meanwhile, Deputy Cole was advised by an assistant district attorney that there did not appear to be any criminal charges that could be brought. Cole had then contacted CRISIS, an entity affiliated with the Kennebec Valley mental health system. The mental health workers

3

requested that Cole take Keiper into protective custody and bring her to Skowhegan for a mental health evaluation.  Cole proceeded to the Jackman area and radioed ahead to Warden Miller, who determined he would attempt to locate Jean Keiper and bring her with him to the Jackman Border Patrol Station where Cole would pick Keiper up for transport to CRISIS.  Cole informed Miller that he had previously searched the residence and had been unable to find the gun, but that he believed Keiper still had the weapon in her possession.

Warden Miller contacted Jason Rodriguez, a local border patrol agent, to assist him at the Keiper residence.  Jackman has no local police department and it is fairly routine to obtain such assistance in potentially dangerous situations.  The two uniformed officers proceeded in separate police vehicles to the Keiper residence.  Ms. Keiper answered the door when they knocked.  Her golden retriever greeted them and the two officers entered the hallway.  There were no guns drawn nor was there any show of force.  The meeting was "low-key" and non-confrontational on both sides.  Keiper was wearing a housecoat over jeans and appeared to have returned from work and settled in for the evening.  Miller explained that he was there because of an emergency situation that had arisen at the hospital connected to an alleged threat she had made against the female physician and her continued possession of a firearm.  Keiper advised the warden that the entire situation had been blown out of proportion.  The warden asked her if she had any weapons on her person and she pulled a box cutter out of her pocket, saying that she had it from work.  The warden observed that Keiper's demeanor was not unusual and that she did not seem to be frightened or to have been drinking alcohol.  Keiper's only apparent irritation was that, as she expressed to Warden Miller, the whole situation had been blown out of proportion.

Warden Miller told Keiper that the best thing for her to do at that point in time was to give him the gun.  She told the warden that he was going to have a hard time finding it and that it

4

was in a place that would be hard to get to.  The warden surmised that the gun had been hidden outside the residence and he asked her if that was the case.  Keiper responded that it was outside, hidden underneath her front porch in a black plastic garbage bag inside a spare tire.  She told the officers that they would not fit under the porch and would need a shovel to get through the snow.  She also requested of them that, "when you get the gun, make sure it goes back to Larry," Keiper's estranged husband.   Warden Miller then informed Keiper that they were going to have to go to the Border Patrol Station to meet the Somerset County deputy who was on his way to transport her for a mental health evaluation.  Keiper asked to go into her bedroom to get fully dressed and the warden allowed her to leave his presence to do that.  While he had the normal law enforcement concerns about letting an individual who was believed to be unstable and in possession of a firearm leave his presence, in Warden Miller's judgment, given Keiper's demeanor and conduct since his arrival at the residence, the risk was minimal and he basically trusted that Keiper would not behave violently toward him.  Keiper changed her clothes, tended to her dog, and left the residence with the two officers.  Once outside on the front porch she pointed out the precise location of the spare tire under the porch.  Miller believed he had plenty of time to return later and retrieve the gun so the officers did not crawl under the porch at that time.  Instead, they transported Keiper to the Border Patrol Station where she was placed in a locked holding room to await Deputy Cole's arrival.  Warden Miller chose not to handcuff Keiper for the short ride to the station because he did not perceive any threat.

      After Cole's arrival at the station, Miller went back to the residence and retrieved the gun.  It was much easier to reach than he thought it would be.  After Miller retrieved the gun he turned it over to a state trooper who had accompanied him and the trooper returned the gun to

Larry Keiper.  Warden Miller did not write any police report about this incident because he did not believe it was a criminal investigation at that time.

After Deputy Cole spoke with Warden Miller he had a brief conversation with Keiper inside the Border Patrol Station.  Cole told her he was going to take her into protective custody and transport her to Augusta for an evaluation.  Keiper asked him why he was doing that when she had told Warden Miller where the gun was and she had told them to go get it and return it to Larry.  Deputy Cole proceeded to escort Keiper to his police vehicle.  She was placed in handcuffs for the ride to Augusta, although Deputy Cole repositioned the handcuffs after placing her in the vehicle so her arms were in front rather than behind her back.  Deputy Cole found Keiper to be quite talkative and on the way to the hospital she talked about her difficulties with drinking, mentioned the gun again, and said a few things about the female physician.  Before they left the Jackman area, Deputy Cole interrupted her and advised her of her rights under Miranda.  Keiper's immediate response after being advised of her rights was:  "Well, I guess I better be quiet."  However, in spite of indicating that she understood her right to remain silent and in spite of the fact that Deputy Cole reminded her of those rights a few times during the one and one half hour trip to Skowhegan, Keiper continued to be quite talkative during the entire trip.

Deputy Cole found Keiper to be pleasant and quite coherent.  She told Cole that she had started drinking alcohol again, although Cole could not detect any signs that she had been drinking that evening.  Keiper told him she and the female physician had been good friends but that things had "gone sour."  She described an occasion when she had gotten intoxicated and showed up at the doctor's residence and there had been a big incident.  According to Keiper she had held romantic feelings for the female physician and would have left her husband to be with her but the female physician did not have reciprocal feelings.  According to Keiper, when she

6

took the gun from her husband's vehicle she had "feelings" she wanted to harm the physician and her family. However, those feelings later went away, she stated, although she confirmed that there had been a three-way conversation between herself, the mental health worker, and the divorce lawyer that may have touched upon these topics.

Sometime after these events and prior to June 10, 2008, when he applied to this Court for an arrest warrant for Keiper, Brent McSweyn of the Bureau of Alcohol, Tobacco, Firearms, and Explosives became aware of the "theft" of the firearm and the events of April 10 and learned that in September of 2000 Jean Keiper had been involuntarily committed to a mental health hospital. McSweyn submitted a report and an affidavit to this Court wherein he never mentioned that anyone obtained Keiper's consent prior to retrieving the firearm from under the porch.

## Discussion

Keiper has moved to suppress all statements she made to both Warden Miller and Deputy Cole on the night of April 10, 2008, and the firearm seized from under her porch, claiming violations of her constitutional rights. The Government justifies the seizure of the firearm as obtained pursuant to a valid consent. In any event, the Government claims the inevitable discovery doctrine would justify the admission of the evidence at trial. As for the statements made by Keiper to Warden Miller, the Government's position is that she was not in custody at the time, and that, even if she had been in custody, the so-called "public safety" exception would apply and the statements about the location of the firearm would be admissible. As to the statements made to Deputy Cole during the ride to Augusta, the Government maintains that Keiper voluntarily waived her Miranda rights and that these statements were not tainted by the earlier admissions to Warden Miller. I agree with the Government's assessment that Keiper's statements were voluntary and that she consented to the seizure of the firearm.

A. Keiper's Statements

Based upon my analysis of the events of April 10, 2008, there are three groups of statements under consideration. First are the statements to Warden Miller made at the Keiper residence prior to leaving for the Border Patrol Station. Second are the custodial statements to Deputy Cole prior to leaving Jackman and finally, there are the statements to Deputy Cole made with the benefit of a Miranda warning while traveling to Augusta. Keiper first moves to suppress her statements to Warden Miller on the ground that they were obtained in violation of her rights under Miranda v. Arizona, 384 U.S. 436 (1966), and Dickerson v. United States, 530 U.S. 428 (2000), because they were the product of an unwarned, custodial interrogation. For purposes of the Fifth Amendment, to be "in custody" means that the defendant has been formally arrested or has had her freedom of movement restrained to the degree associated with a formal arrest. United States v. Ventura, 85 F.3d 708, 710 (1st Cir. 1996); Thompson v. Keohane, 516 U.S. 99, 112 (1995). Whether the restraint on movement is sufficient to rise to the level of an arrest depends on the objective circumstances and how they would be perceived by a reasonable person standing in the shoes of the suspect. Ventura, 85 F.3d at 711. "Relevant circumstances include 'whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation.'" Id. (quoting United States v. Streifel, 781 F.2d 953, 961 n.13 (1st Cir. 1986)).

When Warden Miller and Agent Rodriguez arrived at Keiper's residence, Miller engaged Keiper in a dialogue that was designed to persuade Keiper to reveal the location of the firearm. However, when Keiper revealed the firearm's location to Miller during this conversation, Keiper was not under arrest or subject to restrictions on her freedom of movement equivalent to a formal

8

arrest.  Unwarned statements made in the context of noncustodial police questioning are not subject to exclusion.  See, e.g., Beckwith v. United States, 425 U.S. 341, 345-347 (1976) (holding that home interviews conducted by government agents are not inherently subject to Miranda and explaining, at 346:  "Miranda was grounded squarely in the Court's explicit and detailed assessment of the peculiar 'nature and setting of . . . in-custody interrogation'") (quoting Miranda, 384 U.S. at 445).  It was not until after Keiper revealed the firearm's location that Miller informed her that she needed to go with him for purposes of a mental health evaluation.  Whatever impression that information may have made upon a reasonable person in Keiper's position, Keiper's acknowledgement that she was in possession of the gun and her statement related to the location of the gun already had been made, in an interview context that was thoroughly non-custodial.

  Several minutes later, after having had an opportunity to change her clothing in private and in the absence of any question being asked, Keiper gestured to the firearm's location as she left the home with the officers and stated words indicating where the spare tire containing the firearm would be found.  Even if she was in custody at that moment—though subject only to civil process—she was no longer being subjected to any questioning.  Custodial interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda, 384 U.S. at 444.  After telling Keiper that she must come with him for a transport to CRISIS, Miller did not question Keiper further about the firearm.  Nor was there ever any apparent show of force or compulsion exhibited that she accompany them.

  There is some doubt in my mind whether this situation would even call for a Miranda warning.  See Allen v. Illinois, 478 U.S. 364, 370-75 (1986) (disavowing applicability of

privilege against self-incrimination in the context of civil commitment proceedings and observing that the objective of the privilege is not advanced by applying the rule in this context). Warden Miller understood that he was engaged in civil process and I find that he was not engaging in a tactic of eliciting unwarned statements for purposes of a later criminal prosecution. See Missouri v. Seibert, 542 U.S. 600, 609-12 (2004).  However, for purposes of my analysis I have viewed this as simply a garden variety non-custodial questioning of a "suspect" and a subsequent volunteered statement about the location of evidence.

  The remaining statements in this case are those that Keiper made to Detective Cole at the Border Patrol Station and during the transport to Augusta.  As for her statements at the station, Keiper would like the Court to suppress her question to Cole as to why he was taking her to a crisis intervention since she had already told Miller where the gun was and to take it to Larry. However, like the statement she made on her front porch, this statement was made voluntarily, in the absence of questioning concerning the firearm and in the absence of any police objective of instituting a criminal process against Keiper.  Cole testified that he did not believe he had any cause to subject Keiper to criminal process and I found that testimony to be credible.  Cole merely informed Keiper that he would be transporting her when she made the statement in question.  Thus, even though Keiper was subject to a seizure and was being detained by law enforcement at the time, she was not subjected to any questioning relevant to the pending criminal charge or any other theoretical charge that may have grown out of the events then known to the officers.  As for her statements to Cole during the transport to Augusta, Keiper would have the Court suppress all of them as either unwarned statements or the tainted fruit of prior unwarned statements.  Cole's testimony reflects that Keiper was talkative and made some unspecified comments about the gun and the physician, so he advised her of her Miranda rights

10

before they were out of Jackman. Thereafter, Keiper appears to have related a lot of background information to Cole to explain the situation more fully to him, some of which was related in response to questioning, including statements about why she took the gun and about her intentions with respect to the physician who had sought police protection.[1] I find that these statements were made voluntarily by Keiper following a Miranda warning. Thus, even if Detective Cole was seeking to find probable cause to bring criminal charges against Keiper, he provided her with a Miranda warning as soon as it became apparent that she was going to talk to him about the underlying facts and circumstances that resulted in the CRISIS transport. To the extent that some item of salient information may have been expressed before the warning, I find that Detective Cole was not employing any improper tactic of capitalizing on unwarned statements by subsequently eliciting warned, incriminating statements *à la* Seibert. Keiper acknowledged that she understood the privileges contained in the Miranda warning and there was no coercion that she waive them. That is sufficient to support the finding that Keiper voluntarily, knowingly and intelligently waived her right to remain silent. Colorado v. Spring, 479 U.S. 564, 574 (1987).

  B.  The Firearm

Keiper requests that the firearm be suppressed as fruit of unwarned statements made in answer to custodial interrogation. She also argues that suppression is appropriate because the search proceeded without a warrant despite the availability of sufficient time for the officers to obtain one. The Government responds that Keiper voluntarily consented to the seizure of the firearm.

---

[1] There is no evidence that Cole elicited any unwarned statements concerning facts that would tend to establish probable cause to believe that Keiper was prohibited from possessing firearms by federal law. Furthermore, the relevance of these background statements in relation to the pending possession charge appears somewhat questionable, but their relevance is likely to be addressed by the defendant in a motion in limine prior to trial.

11

"[T]he search of property, without warrant and without probable cause, but with proper consent voluntarily given, is valid under the Fourth Amendment." United States v. Matlock, 415 U.S. 164, 165-66 (1974) (citing Schneckloth v. Bustamonte, 412 U.S. 218 (1973)). The Government has "the burden of proving that the consent was, in fact, freely and voluntarily given," Schneckloth, 412 U.S. at 222, meaning that the consent reflected an exercise of free will, made in the absence of circumstances that might serve to overbear or impair the individual's capacity for self-determination, id. at 225-26. The scope of a consented-to search is measured by what the ordinary reasonable person would understand it to be from the exchange between the individual and the officers. Florida v. Jimeno, 500 U.S. 248, 251 (1991).

Here, the consent to search was given in friendly and familiar surroundings. The exchange between Warden Miller and Keiper was non-confrontational and non-coercive. Certainly Keiper's will was not over-borne through any act of intimidation or manipulation. Miller simply advised Keiper that, in her predicament, given all that had unfolded, it would be best to relinquish the firearm. Viewed objectively, Keiper's statement concerning the firearm's presence under the porch and the need for a shovel to retrieve it, and her later indication of which tire the firearm was in and her request that the officers return it to Larry, communicated not merely a statement of the firearm's present location, but also her voluntary consent to its removal. This reading of Keiper's words and actions is reinforced by her later statement to Cole that she had, in fact, told Miller to take the firearm. In the absence of any factors suggesting coercion, the only reasonable finding on this record is that Keiper voluntarily invited Warden Miller to crawl under her front porch and remove the firearm from her premises. Miller's later retrieval of the firearm was entirely within the scope of Keiper's consent.

**Conclusion**

I recommend the Court adopt the proposed findings and deny the motion to suppress for the reasons set forth above.

**NOTICE**

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the District Court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection. Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the District Court and to appeal the District Court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

September 30, 2008